| | |
|---|---|
| CHICO SERVICE STATION, INC., <u>et al.</u>, | |
| **Plaintiffs,** | **Civil No.:** 09-1342 (JAF) |
| **vs.** | |
| SOL PUERTO RICO LIMITED, | |
| **Defendant** | |

## MOTION TO DISMISS

TO THE HONORABLE COURT:

COMES NOW defendant Sol Puerto Rico Limited ("Sol"), formerly known as The Shell Company (Puerto Rico) Limited,[1] through the undersigned attorneys, and very respectfully moves the Court to dismiss the complaint for lack of subject matter jurisdiction or, in the alternative, to abstain from deciding the merits of the complaint.

## I.

## PRELIMINARY STATEMENT

On April 14, 2009, plaintiffs José Joaquín Chico and Chico Service Station, Inc. (collectively "Plaintiffs" or "Chico") filed this complaint against Sol under the citizen suit provision of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972, (the "Complaint") (Docket No. 1). In the Complaint, Chico raises two claims under RCRA; to wit:

---

[1] Sol was formerly known as The Shell Company (Puerto Rico) Limited ("SCPR"), a for profit corporation organized under the laws of England and duly authorized to conduct business in Puerto Rico. Pursuant to a "Stock Purchase Agreement" executed on June 13, 2006, Sol acquired the ownership of SCPR. Because of the nature of the transaction, SCPR did not cease to exist, but rather it continues to operate under the name of Sol Puerto Rico Limited and has a license to use Shell related trademarks.

(1) under 42 U.S.C.A. § 6972 (a)(1)(A), for alleged violations by Sol of the Puerto Rico Environmental Quality Board ("EQB") regulations related to underground storage tanks ("UST") owned by Sol and operated by Chico, located at a service station (the "Site" or "Station") owned by Chico; and (2) pursuant to 42 U.S.C.A. § 6972(a)(1)(B), for Sol's disposal of solid waste at the Site which allegedly presents an imminent and substantial endangerment to health or the environment.

In regards to the Complaint, Sol respectfully submits, however, that this court lacks subject matter jurisdiction over Chico's RCRA claims insofar as the EQB -- the agency with primary jurisdiction to implement environmental public policy in Puerto Rico -- is diligently prosecuting an enforcement action against Sol at the administrative level regarding the same environmental impacts alleged in the Complaint. In fact, on January 22, 2009, almost two (2) months prior to the filing of the Complaint, the EQB issued an order for Sol to conduct additional sampling at the Site. As such, the agency's actions to remedy any environmental impacts at the Site preclude Chico from filing suit under RCRA's citizen suit provision.

In addition, the Court also lacks jurisdiction over Chico's claims because they are moot. RCRA's citizen suit provision, 42 U.S.C.A. § 6972(a)(1)(A), only provides for injunctive relief to order compliance with the same regulations the EQB is already enforcing. Thus, since Sol is in compliance with the EQB's UST regulations and addressing impacts at the Station under the EQB's supervision, there is no further remedy that the Court can provide pursuant to said provision.

On the other hand, under RCRA's citizen suit provision 42 U.S.C.A. § 6972(a)(1)(B), the court would only be authorized to enjoin Sol from causing any further impacts, if any, and to require the cleanup of any existing impacts in soil and underground waters. However, the only

remedies available to Chico under RCRA are futile because Sol has already been doing, under the EQB's supervision, precisely what Chico is asking this Court to order. The EQB has already issued various orders in an enforcement proceeding to remedy the possible environmental impacts at the Site, providing the same remedies that Chico seeks from this Court. Also, Sol has been and is actively and diligently complying with these orders. Therefore, there is no further relief the Court can provide. It should be noted that there are no underground storage tanks or any related appurtenances at the Station since March 2004. The Station is not in operation since July 2001 and the Site is not being used for any purposes.

In the alternative, should the Court find that it has subject matter jurisdiction over Chico's RCRA claims, principles of comity and federalism counsel the Court to abstain from reaching the merits of those claims. Abstention under the *Burford* doctrine is proper insofar as the state has in place an administrative scheme to establish and enforce environmental policy in this jurisdiction, namely the EQB, which already has this precise matter under its consideration and has been taking active steps to remedy any possible impacts at the Site. Thus, the Court should abstain in deference to the EQB's enforcement action in order to avoid interference with its efforts to establish a uniform and coherent environmental policy for Puerto Rico.

Abstention is also proper under the *Colorado River* doctrine, insofar as there is a <u>parallel ongoing proceeding in the state courts</u> involving the <u>same parties</u> and the <u>same issues</u> as are raised in this complaint. Specifically, on August 14, 2003, Chico filed a complaint in state court alleging several breach of contract claims against Sol. On June 28, 2005, Chico amended that complaint to include allegations that he had allegedly suffered injury due to contamination at the Site and requested *inter alia* that the court order Sol to remedy any contamination at the Site. Thus, Chico initiated litigation in the state court over four (4) years ago raising the same claims

and seeking the same remedy asserted here. Therefore, to avoid vexatious and duplicative litigation, abstention under *Colorado* River is warranted under the facts of this case.

## II.

### FACTUAL BACKGROUND

1.    In accordance with EQB regulations, Sol registered with the EQB five (5) UST's installed at the Site that were to be used for the operation of Shell Station #1759, under UST # 02-86-1017.

2.    In December 8, 1989, pursuant to the Environmental Protection Agency's ("EPA") detection requirements of 40 C.F.R. subpart D, Geopráctica, Inc., as per Sol's request, installed a vapor/groundwater monitoring well in the Station.  (*See*, Copy of "Monitoring Well Installation Report, Sanchez Shell Service Station, PR-3, km. 29.7, Palmer Ward, Río Grande", Exh, A).  As part of said installation, soil samples and a water sample were collected and tested for BTEX.  As a result of said sampling event, impacts were identified in soil and free product was detected in groundwater.

3.    Based on the presence of free product in the monitoring well, in April and May 1990, a site assessment was conducted to determine the presence and extent of the free product and dissolved hydrocarbons.  (*See*, Copy of "Site Assessment-Stage 1 and Subsurface Exploration Report, Sanchez Shell Service Station, PR-3. Km. 29.7, Río Grande", Exh, B).  As part of the assessment, soil and water samples were taken and analyzed for BTEX.

4.    As a result of said assessment, Ivan Usero Pérez discovered that small amounts of product presence were measured in the soil samples tested, particularly from the fill layers; but presence was measured in the water sample taken from the monitoring well.  Therefore, Ivan Usero Pérez concluded that indications were that if a release had occurred in the Site, it had not

been able to spread though the terrain, and was confined to the excavation zone, *i.e.* the area were the gasoline and diesel UST's were located. (*See*, Copy of "Site Assessment-Stage 1 and Subsurface Exploration Report, Sanchez Shell Service Station, PR-3. Km. 29.7, Río Grande", Exh, B).

5.      In April 1990, during the monthly monitoring program performed at the Station by Soil Tech Corporation, as per Sol's request, the presence of liquid phase hydrocarbons was detected in the monitoring well. (*See*, Copy of "Status Report, Sanchez Shell S/S (Jose J. Chico) Shell Code #1759, Río Grande, Puerto Rico, Soil Tech Job No. 90737", Exh, C).

6.      Following said finding, in May and June 1990, Soil Tech Corporation took monthly product readings at the monitoring well. (*See*, Copy of "Status Report, Sanchez Shell S/S (Jose J. Chico) Shell Code #1759, Río Grande, Puerto Rico, Soil Tech Job No. 90737", Exh, C).

7.      As a result of the consistent free product thickness found in the monitoring well, from June 1990 a product skimming device was used to monthly recover free product. (*See*, Copy of "Status Report, Sanchez Shell S/S (Jose J. Chico) Shell Code #1759, Río Grande, Puerto Rico, Soil Tech Job No. 90737", Exh, C).

8.       In January 1992, three (3) additional monitoring wells were installed by Soil Tech Corporation in the Site, as part of an environmental evaluation requested by Sol to be performed at the Station.  The monthly monitoring samples were taken from these monitoring wells until 2000.  (*See*, Copy of Preliminary Environmental Evaluation, Exh, D).

9.      Sol notified the EQB that it had detected the presence of liquid hydrocarbons in the monitoring wells.  (*See* Letter from Sol dated April 5, 1993, Exh. E). This prompted the EQB

to include the site in its Leaking Underground Storage Tank ("LUST") List. (*See* Letter from the EQB dated March 7, 2007, Exh. F).

10.     In November 21, 1995, Sol notified the EQB that it had included the Station in the Action Plan and Response to Leak Detection.  (*See,* copy of Letter dated November 21, 1995, Exh. G). With this letter, Sol included the monthly monitoring sampling results from the monitoring wells of 1994.

11.     In February 2001, Sol requested the EQB to deactivate the Site from the LUST list because monitoring performed during the years 1998-2000 had not reflected the presence of free product in monitoring wells during that time.  (*See,* copy of said Letter dated February 1, 2001, Exh. H).   However, the EQB requested Sol to provide further information and declined to remove the site from the LUST List pending further sampling.

12.     Chico continued to operate the Station until July 2001, when it closed it.  Chico acquired and started operating the Station in April 9,1987. (*See,* copy of Complaint dated August 14, 2003, Exh. I).

13.     In 2002, Sol requested permission from the EQB to remove the five UST's from the station.  The EQB initially approved the request on April 10, 2002.  (*See,* copy of Application for the Closure of the UST's and EQB's authorization, Exh. J and K).

14.     Nevertheless, Sol was not able to remove the UST's within the one (1) year authorization provided by the EQB because Chico would not allow Sol access onto the Site.  (*See,* copy of Letter to EQB dated January 20, 2004, Exh. L).

15.     On August 14, 2003, Chico filed a declaratory judgment complaint against Sol in the Commonwealth Courts.  As it relates to the Station, Chico sought therein a declaration that Sol had failed to comply with a contractual obligation to build certain improvements at the

Station and had, thus, breached several contracts between them. (*See,* copy of said Complaint dated August 14, 2003, Exh. I).

16.     In December 31, 2003, Chico and Sol reached a settlement agreement through which Chico granted Sol access to remove the UST's. In addition, through said agreement the parties agreed that Sol was not responsible for the closure or cleanup of the grease trap. (*See,* copy of Letter to EQB dated January 20, 2004, Exh. L).

17.     In light of the foregoing, Sol was able to remove the UST's and their respective lines in March 2004. During the removal procedures, representatives for both Chico and the EQB were present. (*See,* copy of Letters of EQB and Chico, Exh. M and N).

18.     On May 14, 2004, Sol submitted to the EQB the UST closing report prepared by Test Environmental, Inc. at Sol's request. (*See,* copy of Letter to EQB dated May,14, 2004, Exh. O).

19.     By letter dated July 6, 2004, the EQB ordered Sol to submit a characterization plan for the Site because sampling performed when the UST's were removed revealed the presence of hydrocarbons. (*See,* copy of Letter from EQB dated July 6, 2004, Exh. P).

20.     On July 22, 2004, Sol requested an extension to submit the characterization plan because its consultants were not able to access the Site to perform a visual inspection of the property.

21.     By letter dated October 1st, 2004, Sol submitted a characterization plan to the EQB prepared by Sol's consultant, Environmental Resources Management de Puerto Rico, Inc. ("ERM"). (*See,* copy of Letter to EQB dated October 1st, 2004, Exh. Q). The characterization plan detailed the methods and procedures that would be used to sample the soil and underground water at the site. The characterization plan identified the parameters for which the samples will

be tested. Specifically, for the presence of total petroleum hydrocarbon ("TPH") and for Benzene, Toluene, Ethyl-benzene and Xylene ("BTEX"). As part of the characterization plan, ERM included the preparation of a Risk Based Corrective Action ("RBCA") analysis to determine whether the impacts found were or represented a threat to human health or the environment. The EQB approved the characterization plan on December 10, 2004. (*See,* copy of Letter from EQB authorizing the characterization plan, Exh. R).

22. The characterization plan was implemented by Sol's consultant, ERM, beginning in January 2005. (*See,* copy of Letter dated , Exh. S). During the years 2005 and 2006, ERM performed the required sampling events at the Site in accordance with the characterization plan.

23. On June 28, 2005, Chico amended the state-court complaint to include a claim for environmental damages. (*See,* copy of Amended Complaint, Exh. T). Chico alleged that sampling events performed when the UST's were removed from the Site revealed the presence of hydrocarbon impacts in the soil and groundwater. Chico specifically requested a declaration that Sol was obligated to return the Site to Chico free of any alleged contamination. Chico further requested payment of over $2,000,000 for damages allegedly caused by contamination at the Site.

24. By letter dated December 19, 2006, Chico petitioned the EQB to be kept informed and given notice of all proceedings before it related to the Site. (*See,* copy of said Letter, Exh. U). Chico also requested that the EQB apprise him of the current status of the proceedings, including any characterization and remediation that had been ordered as well as an estimate of the time it would take to complete the remediation.

25. On January 16, 2007, Sol submitted to the EQB a Phase II Investigation and Tier I and Tier II Risk Assessment (the "Report"). (*See,* copy of said Letter to EQB, Exh. V). The

Report contained the results of the sampling events performed at the site during the years 2005 and 2006, including the vertical and horizontal extension of the hydrocarbon presence previously identified in other studies. In particular, hydrocarbon impacts were identified in soil and groundwater at the Site.

26.     By letter dated March 7, 2007, the EQB informed Chico's attorney that it had not yet reviewed the Report because the EQB was in the initial stages of a process in coordination with the EPA to establish local guidelines for evaluation of RBCA. Thus, because the EQB did not have any local criteria for evaluation of RBCA, it could not review the Report until it concluded the process. (*See* Letter from the EQB dated March 7, 2007, Exh. F).

27.     The EQB further informed Chico that it required evidence in the form of contracts of legal documents to establish the ownership, and liability, of the grease traps and septic tank located at the station.

28.      In April 10 and 11, 2008, Sol, through its consultant, ERM, conducted a voluntary supplemental sampling event at the Site to determine whether natural attenuation and other factors had resulted in the reduction of the previously found hydrocarbon impacts in soil and groundwater at the Site.

29.     In May 16, 2008, Sol submitted the report summarizing the supplemental sampling event's findings to the EQB (the "Study"). (*See,* copy of said Letter to EQB, Exh. W). Specifically, through the Study, Sol's consultant, ERM concluded that the hydrocarbon impacts in unsaturated soil samples had reduced significantly since 2006 (*i.e.*, below the 100ppm action level used by EQB). However, impacts to groundwater were still detected. As such, ERM proposed the use of enhanced aerobic bioremediation technology as in-situ remediation for the impacts detected in groundwater.

30.     By letter dated May 28, 2008, Chico reacted to Sol's submissions to the EQB by complaining that Sol had not complied with the characterization plan that the EQB had approved in 2004.  (*See,* Letter from EQB to Chico dated May 28,2008, Exh. X).  Chico stated that he opposed the RBCA submitted by Sol because the EQB did not have the proper guidelines for its evaluation and requested that the EQB reject the Report due to the alleged deficiencies in the implementation of the characterization plan.

31.     By letter dated September 29, 2008, Chico submitted a report by its purported expert Carlos Belgodere in response to the EQB's letter of March 7, 2007.  (*See,* Letter from Chico to EQB dated September 29,2008, Exh. Y).  The letter stated that the report contained evidence of the ownership of the septic tank and grease traps at the Site.  Chico also requested in the letter that because free product had been detected in the soil and groundwater at the station, the EQB should order Sol to perform testing at the site for organic lead.  Chico threatened to file a petition for mandamus if the EQB did not comply with the request within ten days.

32.     On October 17, 2008, Plaintiffs filed a separate action for mandamus in the Commonwealth Courts seeking to compel the EQB to order Sol to sample for lead at the Site.[2] (*See,* Copy of Petition of Mandamus and related documents, Exh. Z).

33.     By letter dated November 25, 2008, the EQB rejected the Report because it still did not yet have any guidelines in place to review the RBCA. (*See,* Copy of EQB's letter dated November 25,2008, Exh. AA).

34.     By letter dated January 22, 2009, the EQB also rejected the Study, stating as the sole reason that it was based on the Risk Assessment that had previously been rejected due to a

---

[2] The *mandamus* petition was filed under the caption *Chico Service Station, Inc. v. Junta de Calidad Ambiental,* Civil Núm. K PE2008-3556, before the Court of First Instance, San Juan Division. In this case the parties agreed that the EQB will have a 60 day period to evaluate whether it was necessary to require Sol to sample for lead in the Site.  Thus, the court dismissed the case because it was moot.

lack of evaluating guidelines. (*See,* Copy of EQB's letter dated January 22, 2009, Exh. BB). The EQB further ordered Sol to submit a new characterization plan for the site, including chemical analysis for TPH, BTEX, lead and MTBE. The EQB stated that any characterization plan must be approved by the agency before any work is performed.

35.     The EQB letter required Sol to comply with all UST regulations, RCRA, and applicable federal regulations.

36.     On February 12, 2009, Sol met with representatives from the EQB to discuss the January 22, 2009 letter. During this meeting, Sol requested partial reconsideration of the EQB's January 22, 2009 order. Sol argued that it should not be required to re-test for TPH and BTEX, since said sampling had already been performed, in virtue of EQB's approved characterization plan. It also requested that the EQB do not discard the results of the Report and Study since they were scientifically valid. Sol posited that the two reports could be reviewed independently and that the EQB could evaluate the testing samples because RBCA was a separate analysis that does not interfere with the validity of the test results. Based on the foregoing, the EQB approved Sol's proposition to summarize the Report and Study's findings and result in a new report without including the separate RBCA analysis (the "Compiled Report").

37.     By letter dated April 14, 2009, Sol submitted the Compiled Report, as authorized and requested by the EQB. (*See,* Copy of Letter to EQB dated April 13, 2009, Exh. CC). The Compiled Report included a Remediation Plan for the impacts found in groundwater at the Site. In addition, Sol submitted its testing plans for lead and MTBE as requested by the EQB.

# III.

## ARGUMENT

A.  <u>The Court Lacks Subject Matter Jurisdiction Over the RCRA Claims</u>

1.  <u>Applicable Standard</u>

The diligent prosecution bar to citizen suits under the federal environmental statutes presents a question of subject matter jurisdiction to be decided under the Fed. R. Civ. P. 12(b)(1) framework.  *Community of Cambridge Envir. Health & Comm. Devel. Group v. City of Cambridge*, 115 F. Supp.2d 550, 554 (D. Md. 2000) (lack of diligent prosecution under analogous Clean Water Act provision is a "necessary precondition for the court's jurisdiction"); *Environmental Integrity Project v. Mirant Corp.*, 2007 WL 62619, *1 & n. 1 (D. Md. Jan. 3, 2007) (dismissing private cause of action for lack of subject matter jurisdiction based on diligent prosecution under analogous Clean Water Act provision).[3]  When faced with a motion to dismiss for lack of subject matter jurisdiction, "the district court must construe the complaint liberally, treating all well-pleaded facts as true and indulging all reasonable inferences in favor of plaintiff." *Aversa v. United States*, 99 F.3d 1200, 1210 (1st Cir. 1996).   Nevertheless, "the Court may consider material outside of the pleadings of the action when dealing with a factual attack on subject matter jurisdiction, such as affidavits and testimony, without converting the motion to dismiss into one for summary judgment." *Menendez v. U.S.*, 67 F. Supp.2d 42, 45 (D.P.R. 1999) (*citing Caribbean Mushroom Co. Inc. v. Government Development Bank*, 980 F. Supp. 620, 622 (D.P.R. 1997); *Moreno v. John Crane, Inc.*, 963 F. Supp. 72, 73 (D.P.R.1997)).  Furthermore, the plaintiff "bears the ultimate burden of proving that subject matter jurisdiction exists, *Aversa*, 99 F.3d at 1209, and 'argumentative inferences favorable to the pleader should not be drawn.'" *Id.*

---

[3]  The citizen suit provision in RCRA, 42 U.S.C. § 6972, is modeled after the similar provision of the Clean Air Act, 42 U.S.C. § 7604, and many other federal environmental statues now have similar provisions.  *Hallstrom v. Tillamook County*, 493 U.S. 20, 22 (1990).  Accordingly, in many instances authorities interpreting the citizen suit provision of one environmental statute are applicable by analogy to another environmental statute.

(*Quoting Atlantic Mutual Insurance Company v. Balfour Maclaine International Ltd.*, 775 F. Supp. 101, 104 (S.D.N.Y.1991)).

2. The EQB's Diligent Prosecution of an Enforcement Proceeding Against Sol for Remediation of Impacts at the Site Precludes Chico from Seeking Same Remedies Under RCRA's Citizen Suit Provisions

Chico premises its claims against Sol under RCRA's citizen suit provisions, 42 U.S.C. § 6972(a)(1)(A) & (a)(1)(B), which give the federal courts authority to order compliance with environmental regulations and to remedy possible soil and underground water contamination. RCRA, however, imposes an explicit statutory bar to the commencement of any citizen suit when the Environmental Protection Agency ("EPA"), or the state agency charged with the primary responsibility of enforcing environmental policy, in this case the EQB, has taken diligent action[4] to abate and remedy the alleged contamination which serves as a basis for the citizen suit. RCRA specifically provides that,

(b)(1)   No action may be commenced under subsection (a)(1)(A) of this section --
…
(B)   if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States or a State to require compliance with such permit, standard, regulation, condition, requirement, prohibition, or order.

(b)(2)(B)   No action may be commenced under subsection (a)(1)(B) of this section if the Administrator, in order to restrain or abate acts or conditions which may have contributed or are contributing to the activities which may present the alleged endangerment--

---

[4] Although § 6972(a)(1)(A) provides that diligent prosecution bar is only available when the agency has filed an action in the state or federal courts, the fact that the EQB has the legal authority to force compliance with its orders and review of its orders is available directly to the appellate courts, the EQB's enforcement actions are the functional equivalent of a proceeding filed in the courts. *See, e.g., See North & South Rivers Watershed Ass'n.*, 949 F.2d at 557 (Finding that when the defendant has "complied with a variety of mandatory and ongoing tasks" pursuant to an order from the agency, the "State Order represents a substantial, considered, and ongoing response to the violation, and that the [agency's] enforcement action does in fact represent diligent prosecution"); *SURCCO v. PRASA*, 157 F.Supp.2d 160, 168-169 (D.P.R. 2001) (Finding that agency adjudication is the equivalent of an action in the courts). In any event, to the extent Sol is complying with EQB regulations, the claims under this subsection are moot as discussed below.

> (i)     has commenced and is diligently prosecuting an action under
>         section 6973 of this title or under section 106 of [CERCLA],
> …
> (iv)    has obtained a court order (including a consent decree) or issued an
>         administrative order under section 106 of [CERCLA] or section
>         6973 of this title pursuant to which a responsible party is diligently
>         conducting a removal action, Remedial Investigation and
>         Feasibility Study (RIFS), or proceeding with a remedial action.
>
> (b)(2)(C)     No action may be commenced under subsection (a)(1)(B) of this section if
>               the State, in order to restrain or abate acts or conditions which
>               may have contributed or are contributing to the activities which may
>               present the alleged endangerment--
>
> (i)     has commenced and is diligently prosecuting an action under
>         subsection (a)(1)(B) of this section,

42 U.S.C. § 6972.

This provision barring private suits when governmental agencies have taken diligent action reveals Congress' intent "that the citizen suit is meant to supplement rather than to supplant governmental action." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 60 (1987) (interpreting analogous provision of the Clean Water Act, 33 U.S.C. § 1365). Thus, Congress expected that "the great volume of enforcement actions [should be] brought by the State, and **citizen suits are proper only** 'if the Federal and local agencies **fail to exercise their enforcement responsibility**.'" *Id.* (*quoting* S. Rep. No. 92-414, p. 64 (1971)) (emphasis added).

> Both Congress and the Supreme Court have recognized: (1) that the primary responsibility for enforcement of the [environmental statutes] rests with the government; (2) that citizen suits are intended to supplement rather than supplant this primary responsibility; and (3) that citizen suits are only proper if the government fails to exercise its enforcement responsibility.

*North & South Rivers Watershed Ass'n. v. Town of Scituate*, 949 F.2d 552, 558 (1st Cir. 1991).

"This assertion is founded on an undisputable verity: the **principal responsibility for implementing and enforcing RCRA resides with EPA, not with citizens** acting as private attorneys general." *Maine People's Alliance and Natural Resources Defense Council v.*

*Mallinckrodt, Inc.*, 471 F.3d 277, 292 (1st Cir. 2006) (*citing Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 483-484 (1996)) (emphasis added).

The plaintiff, as a private party prosecuting a citizen suit, bears the burden of demonstrating that the governmental enforcement action is not being prosecuted diligently. *See Cmty. Of Cambridge*, 115 F. Supp.2d at 554; *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 890 F. Supp. 470, 487 (D.S.C. 1995). "This burden is a heavy one because **diligence** on the part of the enforcement agency **is presumed**." *Laidlaw*, 890 F. Supp. at 487 (emphasis added). The presumption of diligence is overcome only by "persuasive testimony that the State has engaged in a pattern of conduct in its prosecution that could be considered dilatory, collusive or otherwise in bad faith." *Connecticut Coastal Fisherman's Ass'n. v. Remington Arms Co.*, 777 F. supp. 173, 183 (D. Conn. 1991) (internal quotations and citations omitted).

In addition, because of the statutory preference for governmental enforcement actions, courts show "substantial" or "great" deference to the federal or state agency's judgment as to how best to enforce the environmental laws. "Where an agency has specifically addressed the concerns of an analogous citizen's suit, deference to the agency's plan of attack should be particularly favored." *North & South Rivers Watershed Ass'n.*, 949 F.2d at 557; *see also Cmty. Of Cambridge*, 115 F. Supp.2d at 554 ("substantial deference for the agency's process" in enforcing Clean Water Act); *Arkansas Wildlife Fed'n. v. IC Americas, Inc.*, 842 F. Supp. 1140, 1147 (E.D. Ark. 1993) (state agency "must be given great deference to proceed in a manner it considers in the best interests of all parties involved"). A plaintiff's mere unhappiness with a state prosecution does not overcome the presumption. "Merely because the State may not be taking the precise action [plaintiff] wants it to or moving with the alacrity [plaintiff] desires does not entitle [plaintiff] to injunctive relief." *North & South Rivers Watershed Ass'n.*, 949 F.2d at 558.

In this case, EQB is prosecuting an enforcement proceeding against Sol for the possible contamination at the site. As stated by the agency itself in a letter dated March 7, 2007, addressed to Chico's attorneys, when Sol removed the USTS's from the Site it reported the presence of hydrocarbons in the soil and groundwater. As far back as July 6, 2004, the EQB has ordered Sol to conduct sampling at the site to determine the extent and presence of contamination, which Sol has done. The EQB has been monitoring the results and, in fact, just recently, on January 22, 2009, it ordered Sol to perform further testing at the Site, which was not previously required. On April 14, 2009, coincidentally the same day Chico filed the Complaint but before Sol was served, Sol submitted the Compiled Report, which includes the proposed remediation plan and the sampling plans for lead and MTBE in compliance with the January 22, 2009 order. Once the EQB approves the plan, Sol will perform the sampling events and will carry out the proposed corrective measure at the Site. It should be noted that Chico is fully aware of these ongoing proceedings, since he has been actively intervening in those proceedings. In fact, it was at Chico's request that the EQB ordered Sol to perform testing of at the Site. Plaintiffs even filed a separate action for mandamus in the Commonwealth Courts seeking to compel the EQB to order Sol to sample for lead in the Site. Also, Sol has been sending Chico with documents filed at the EQB as part of its discovery obligation under the Chico Case being filed in the Puerto Rico Superior Court.

The fact that the EQB has instituted an enforcement action against Sol for possible environmental impacts at the Site, coupled with Sol's diligent compliance with the EQB's orders and requirements, are sufficient to support a finding that the EQB is diligently prosecuting an action against Sol. *See North & South Rivers Watershed Ass'n.*, 949 F.2d at 557 (Finding that when the defendant has "complied with a variety of mandatory and ongoing tasks" pursuant to an order from the agency, the "**State Order represents a substantial, considered, and ongoing**

**response to the violation, and that the [agency's] enforcement action does in fact represent diligent prosecution**") (emphasis added).

RCRA further provides that when the diligent prosecution bar is premised on an administrative order, citizen suits "are prohibited only as to the scope and duration of the administrative order." 42 U.S.C. § 6972(b)(2)(B). The relief Chico seeks through this RCRA action <u>is the same</u> as the EQB has already implemented through its enforcement proceeding. Chico requests from this Court that it order Sol to "conduct the necessary testing and corrective action and remove and eliminate all pollution and contamination" at the site. (Complaint, Docket No. 1, ¶ 40). Nevertheless, not only has Sol already performed the required sampling at the Site under the EQB's supervision, but the EQB has recently ordered it to conduct further testing and sampling for parameters not previously required, such as lead as Chico specifically requested. In due course, once further testing is completed in compliance with the EQB's January 22, 2009 order, the EQB will undoubtedly order the remediation procedures it deems appropriate. To this effect, Sol has already submitted a remediation plan to address the hydrocarbon impacts found in groundwater that is currently being evaluated by the EQB. Thus, to the extent Chico's RCRA claims seek the same remedies already implemented by the EQB, this citizen suit is barred.

3. <u>Chico's Claims are Moot Insofar as Sol has complied with all Relevant UST Regulations and is Actively Taking Steps to Remedy Possible Contamination at the Site</u>

The Court also lacks subject matter jurisdiction over Chico's RCRA claims because the claims are moot and have been so since before he filed this complaint. The U.S. Constitution confines the jurisdiction of the federal courts to actual cases and controversies. *See* U.S. Const. Art. III, § 2, cl. 1. "This prerequisite must be satisfied at each and every stage of the litigation." *Connectu LLC v. Zuckerberg*, 522 F.3d 82, 88 (1st Cir. 2008) (citations omitted). The mootness doctrine "enforces the mandate 'that an actual controversy must be extant at all stages of the

review, not merely at the time the complaint is filed.'" *Mangual v. Rotger-Sabat*, 317 F.3d 45, 60 (1st Cir. 2003) (*quoting Steffel v. Thompson*, 415 U.S. 452, 460 n. 10 (1974)). Mootness is viewed "as the doctrine of standing set in a time frame." *Mangual*, 317 F.3d at 60 (internal quotations and citations omitted). It "is particularly applicable in cases where injunctive relief is sought[;]… [w]here the activities sought to be enjoined have already occurred." *Center for Marine Conservation v. Brown*, 917 F. Supp. 1128, 1142 (S.D. Tex.1996) (citation omitted).

RCRA's citizen suit provision provides that a Court may issue injunctive relief only when there is a continuing violation. *See, e.g*., Gache v. Town of Harrison, 813 F. Supp. 1037, 1041 (S.D.N.Y. 1993) ("[W]holly past violations of RCRA cannot be subject to citizens suits under § 7002 of RCRA"). Courts have construed the "alleged to be in violation" language also found in identical citizen suit provisions in other environmental laws as authorizing citizen suits **only when there is a continuing or intermittent violation**. *See, e.g., Gwaltney*, 484 U.S. at 64 (Clean Water Act); *Pawtuxet Cove Marina, Inc. v. Ciba-Geigy Corp.*, 807 F.2d 1089, 1093 (1st Cir. 1986) (Clean Water Act and Clean Air Act).

a. RCRA Claims Brought Pursuant to § 6972(a)(1)(A)

Chico alleges in his complaint that Sol is in violation of several EQB regulations with regards to the UST's formerly installed at the site.[5] To wit, Chico alleges violations of regulations 501 (Duty to provide **notice** of possible release to the EQB within 24 hours of detection); 503 (Duty to **investigate and confirm** possible release within seven days); 601 (Duty to comply with regulations once release is confirmed); 602 (A) & (B) (Duty to provide **notice** to EQB within 24 hours and to take steps to **prevent further releases**); 603 (A) (Duty to perform

---

[5] In the complaint Chico alleges that a review of the EQB's UST File No. UT-86-1380 reveals that Sol has not complied with the requirements of several agency regulations. (Complaint, Docket No. 1 ¶ 22). Nevertheless, the UST File assigned to the former Shell Station 1759, located at Carr. #3 Km. 29.7, Rio Grande, Puerto Rico, the station subject of this complaint, is No. **UST 86-1017**.

initial **mitigation and investigation** measures); 604 (A) & (C) (Duty to submit to the EQB an initial **characterization** of the site within 45 days); 606 (A)(1)(3) (Duty to perform **investigation and remediation** of soil and underground waters). [6]

In 1993, Sol notified the EQB of a suspected release of free product in the Site, and it is in compliance, and has been in compliance with these regulations since long before Chico sent his notice of intent to sue in October 2008. Sol has given notice to the EQB every time that sampling or monitoring at the site has revealed the presence of impacts in the soil or groundwater in the Site. In a letter addressed to Chico's attorneys, the EQB acknowledges that Sol notified the presence of liquid hydrocarbons at the Site in 1993, which prompted the agency to include the site in its Leaking Underground Storage Tank ("LUST") List. (EQB Letter Dated March 7, 2007, Exhibit 18). Sol further reported the presence of hydrocarbons at the site on May 20, 2004, after it removed the UST's and submitted the UST closing report, again on January 18, 2007 when it submitted the Report with the results of testing performed during 2005 and 2006, and finally in May 16, 2008, when the submitted the Study. Thus, it is undisputable that Sol has complied with the requirement that to give notice to the EQB of any suspected release at the site and is in compliance with regulations 501 and 602. It is irrelevant to this inquiry if Sol's compliance came within the required time period, since any delay in providing notice to the EQB may be a "wholly past violation" which RCRA is not meant to address. *See, e.g., Gwaltney,* 484 U.S. at 57 (Holding that federal courts lack jurisdiction over "wholly past violations" under the Clean Water Act). The fact remains that long before Chico even sent the RCRA notice, Sol had notified the EQB of suspected releases at the station.

---

[6] It should also be noticed that same obligations are imposed over Chico as <u>operator</u> of the Station.

Sol is also in compliance with the EQB regulations requiring that it investigate any releases at the site. On July 6, 2004, after Sol reported the presence of hydrocarbons, the EQB ordered Sol to submit a characterization plan, which Sol submitted on October 4, 2004. The EQB approved the plan on December 10, 2004, and Sol began implementing it in January 2005. Sol also performed further sampling and monitoring throughout the years 2005, 2006 and 2008 and, pursuant to the EQB's January 22, 2009 order, it will be required to perform further testing once its latest sampling plans for lead and methyl tertiary butyl ether ("MTBE") are approved by the EQB. Chico is fully aware that Sol has performed the sampling at the Site, since Sol needs his permission to enter the premises and his representatives have been present during the sampling procedures. Thus, insofar as Sol has performed the sampling events and characterization at the Site under the EQB's direct supervision, it is in full compliance with regulations 503, 603, 604, and 606 as well.

Sol is also undeniably in compliance with the requirement to take measures to mitigate contamination and prevent further releases. It is undisputable that the station ceased operations in July 2001 and that the UST's were removed in March of 2004. They would have been removed in 2001 had Chico not impeded Sol's access to the property. Since no product has been stored at the Site for approximately 8 years, and because the removal of the UST's precludes any future storage of product at the Site, there is no possibility of further releases that may be attributable to Sol and Sol has complied with regulations 602 and 603.

Finally, Sol is in compliance with the requirement to remediate any impacts found at the Site as well. Although remediation at the Site is not complete, remediation procedures are well underway. Sol has already submitted a remediation plan for the hydrocarbon impacts detected in the groundwater at the Site. However, before any remediation efforts can begin, Sol

needs EQB's approval to commence the proposed corrective measures. EQB regulations require that any sampling and remediation be done under the EQB's supervision, which means that the EQB needs to approve any testing and remediation plan before Sol can proceed. *See, e.g.* UST Regulation No. 607 (Establishing that the EQB must evaluate and approve any remediation plan before the <u>owner</u> or <u>operator</u> can begin remediation procedures). Thus, because Sol has been working with the EQB to investigate and eventually remediate any impact found at the Site, it is in compliance with the requirement of regulation 606. Accordingly, Chico's § 6972(a)(1)(A) claims compel compliance with EQB regulations are moot.

b. <u>RCRA Claims Brought Pursuant to § 6972(a)(1)(B)</u>

Section 6972(a)(1)(B) authorizes a citizen-suit plaintiff to seek injunctive relief against any person who has contributed to the "handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment."[7] The only remedy available under this section is for the Court to issue an injunction restraining such person from allowing <u>further</u> contamination at the site and ordering such person to take any actions necessary to remedy the contamination. *See* § 6972(a).

As fully discussed above, because the UST's at the Site have not been used since 2001, and where in fact removed with all related appurtenances in March 2004, there is no possibility of further petroleum impacts at the Site that may be attributable to Sol. Thus, any request for injunctive relief to prevent further contamination is clearly moot.

Moreover, Sol has already been performing testing at the Site under the EQB's supervision. Once that procedure is complete, Sol will begin remediation under a plan authorized by the EQB, as required by its regulations. Thus, there is no further remedy that the

---

[7] The Court should note that under RCRA and EQB regulations, Chico, as the operator, is jointly liable for the remediation of any contamination at the Site. Note that the responsibility for the impacts found at the Site is a question and controversy pending at the Puerto Rico Superior Court.

Court could issue to address Chico's claims since Sol is already doing what Chico wants the Court to order.

The only remedy that Chico is seeking which is not comprised in the agency's actions is the imposition of civil penalties against Sol. Nevertheless, because the EQB has the authority to impose civil penalties under its regulations, *see, e.g.,* UST Regulation 1010, and has so far not exercised that authority, Chico is precluded from seeking those penalties under RCRA. "It is enough that the [state] statutory scheme, under which the State is diligently proceeding, contains penalty assessment provisions comparable to the Federal Act, that the State is authorized to assess those penalties, and that the overall scheme of the two acts is aimed at correcting the same violations, thereby achieving the same goals." *See North & South Rivers Watershed Ass'n.*, 949 F.2d at 556. Accordingly, Chico's § 6972(a)(1)(B) claim is also moot.

B.     In the Alternative, the Court Should Decline to Entertain the Merits of the RCRA Claims Under the Abstention Doctrines

1.     *Burford* Abstention

Pursuant to *Burford v. Sun Oil Co.*, 319 U.S. 315, 333-34 (1943) and its progeny:

> [A] federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies when: 1) there are difficult policy problems of substantial public import whose importance transcends the result in the case then at bar; or 2) where the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial state concern.

*Sprintcom, Inc., v. P.R. Regulations & Permits Admin.*, 490 F. Supp.2d 238, 243-44 (D.P.R. 2007) (*citing New Orleans Pub. Serv., Inc. (NOPSI) v. New Orleans*, 491 U.S. 350, 361 (1988)). The *Burford* abstention doctrine involves the fundamental concern of preventing "federal courts from bypassing a state administrative scheme and resolving issues of state law and policy that are committed in the first instance to expert administrative resolution." *Sevigny v. Employers Ins. of Wausau*, 411 F.3d 24, 27 (1st Cir. 2005) (*quoting Pub. Serv. Co. of N.H. v. Patch*, 167 F.3d 15, 24 (1st Cir. 1998)). Federal courts should abstain unless there are "predominating

federal issues that do not require resolution of doubtful questions of law and policy." *Patch*, 167 F.3d at 24. *Burford* is applicable "where deference to a state's administrative processes for the determination of complex, policy-laden, state-law issues would serve a significant local interest and would render federal-court review inappropriate." *Behavioral Healthcare Partners, Inc. v. Gonzalez-Rivera*, 392 F. Supp.2d 191, 199 (D.P.R. 2005) (citations omitted). *See Sevigny*, 411 F.3d at 26 ("*Burford* requires in certain circumstances a federal court to abstain in favor of state processes where federal litigation would interfere with a state administrative scheme and where adequate state judicial review exists.")

Abstention under *Burford* is appropriate when the federal court's decision requires "significant familiarity with . . . distinctively local regulatory facts or policies," *Fragoso*, 991 F.2d at 884 (*citing NOPSI*, 491 U.S. at 364), and where the Court's adjudication would "unduly intrude into the processes of state government or undermine the State's ability to maintain desired uniformity." *NOPSI*, 491 U.S. at 363; *see also Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 728 (1996) ("question under *Burford* is whether adjudication in federal court would unduly intrude into the processes of state government or undermine the State's ability to maintain desired uniformity") (internal quotation marks and citations omitted). The state agency in charge of implementing the RCRA according to the Commonwealth's environmental policy should be left to decide the issue.

Chico's RCRA claim seems but an attempt to impermissibly circumvent or second-guess the EQB's enforcement action. His claim does not involve any federal interests or questions of federal law. In fact, Chico does not ask this court to determine whether there are any violations of federal law. What Chico is seeking with this RCRA citizen suit is to force Sol to comply with **state regulations** as established and promulgated by the EQB. (*See* Complaint, Docket No. 1 ¶¶ 16-18, 20, 30). Chico does not challenge the constitutionality of the EQB's proceedings or authority, or allege that the remedies that the agency has provided and will continue to provide as

its enforcement proceeding goes forward are inappropriate. *Cf. Corporación Insular de Seguros v. García*, 680 F. Supp. 476, 481 (D.P.R. 1988) (Refusing to abstain because the case involved only federal constitutional claims that simply mirrored claims brought in state court under the state constitution). In essence, Plaintiffs' claim involves a matter best categorized as a "local problem." *Quackenbush*, 517 U.S. at 727. That the EPA delegated its authority to the EQB to establish and enforce environmental policy in Puerto Rico is evidence that it considered it a local issue. Clearly, the lack of any federal interests at stake must tilt the balance in favor of abstention.

Furthermore, considerations of federalism, comity and judicial efficiency warrant abstention. *See Fragoso*, 991 F.2d at 885 (1st Cir. 1993) (*quoting Medical Malpractice Joint Underwriting Ass'n v. Pfeiffer*, 832 F.2d 240, 244 (1st Cir. 1987)). This case is precisely the kind of case for which the *Burford* abstention was created. It is a case involving matters of "state interest," regarding what is essentially a local issue of substantial public importance, to wit environmental policy, and the exercise of federal review would likely disrupt the Commonwealth's efforts to establish coherent and uniform policy regarding a matter of public concern. *See NOPSI*, 491 U.S. at 361 (*quoting Colorado River*, 424 U.S. at 814).

2. *Colorado River* Abstention

Abstention is also proper under *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976), insofar as there are ongoing proceedings in state court involving the same parties and the same issues involved in this RCRA litigation. "In *Colorado River* the Supreme Court held that in certain circumstances, a court may abstain from hearing a case 'due to the presence of a concurrent state proceeding for reasons of wise judicial administration.'" *U.S. v. Fairway Capital Corp.*, 483 F.3d 34, 40 (1st Cir. 2007) (*quoting Colorado River*, 424 U.S. at 818). Although the First Circuit has established that "these circumstances are quite limited, and that there is a 'heavy presumption favoring the exercise of jurisdiction,'" *Id.* (*quoting Villa*

*Marina Yacht Sales, Inc. v. Hatteras Yachts*, 915 F.2d 7, 13 (1st Cir. 1990)), it has nevertheless set forth eight factors for the district courts to consider in determining whether such limited circumstances exist:

> (1) whether either court has assumed jurisdiction over a res; (2) the inconvenience of the federal forum; (3) the desirability of avoiding piecemeal litigation; (4) the order in which the forums obtained jurisdiction; (5) whether state or federal law controls; (6) the adequacy of the state forum to protect the parties' interests; (7) the vexatious or contrived nature of the federal claim; and (8) respect for the principles underlying removal jurisdiction.

*KPS & Assocs. v. Designs by FMC, Inc.*, 318 F.3d 1, 10 (1st Cir. 2003). These factors are not "exhaustive, nor is any one factor necessarily determinative." *Id.* "[T]he decision whether to dismiss a federal action because of parallel state-court litigation does not rest upon a mechanical checklist, but on a careful balancing of the important factors as they apply in a given case." *Moses H. Cone,* 460 U.S. at 16. "The weight to be given to any one factor may vary greatly from case to case, depending upon the particular setting of the case." *Id.*

This case fits perfectly within the narrow mold of cases in which *Colorado River* counsels abstention in favor of the ongoing state proceeding. Chico first filed the case in the Puerto Rico courts in 2003, alleging breach of contract claims against Sol for certain repairs and improvements. On June 28, 2005, Chico amended the complaint to allege that he had suffered injury due to contamination at the site and requested as remedy that Sol pay millions of dollars in damages as well as the remediation of all contamination at the site. (*See* Copy of State Court Amended Complaint, Exh. T, ¶¶ 37-39, 47). Thus, Chico is seeking in the state case the same remedy that he seeks here, remediation of contamination at the site, and both courts have equal authority to provide the remedy. Yet, consideration of the factors outlined above, counsels in favor of abstention because of the specific facts of this case.

The first factor, jurisdiction over a *res*, is inapplicable since, although the controversy revolve around a property, the claims do not involve the property itself.

As to the second factor, inconvenience of the federal forum, while the federal court is as equally accessible to both parties as the state court, because the parties have been litigating the issues for nearly four years in the state court and because the parties are preparing for trial in the state court (scheduled for August/September 2009), they would likely have to incur in the costs of translating documents in to English which have already been prepared in Spanish, which would certainly result in inconvenience, and litigating identical issues.

The third factor, the desire to avoid piecemeal litigation, is of particular importance in this case and should be weighed accordingly. The Court should consider that this is the third currently ongoing proceeding where Chico is seeking the same remedies, not counting the *Mandamus* petition Chico filed in state court against the EQB which has been mooted by the agency's January 22, 2009 order. The potential for wasteful and duplicative efforts, as well as the potential for inconsistent rulings are certainly present and should be avoided.

The fourth factor, the order in which both cases were filed, also counsels for abstention. The state court has had jurisdiction over the parties since 2003 and over the environmental claims since the amendment to the complaint in 2005. The state court case is in an advanced stage, trial being scheduled for August of 2009. This Court was pulled into the controversy four years later.

The fifth factor, whether federal law controls, equally favors abstention. Although Chico filed this suit under a federal law, the fact is that the relief he is seeking is controlled by state law. Chico is seeking Sol's compliance with state UST regulations. Moreover, because of the EPA delegation of authority to the EQB, any sampling and remediation at the Site that the Court may order will need to be performed in accordance with the EQB's regulations and under the EQB's supervision. Thus, federal law is not controlling.

As to the sixth factor, whether the state court can adequately protect the parties' interests, Chico does not allege that the state remedies would be inappropriate. In fact he cannot since the

state court under its broad grant of powers could order Sol to remediate the impacts found at the Site, if warranted, or defer to the EQB's actions, which mirror the ones sought here.  He could in fact be afforded additional remedies in the state court, such as damages, since damages are not available under RCRA.[8]

The seventh factor, the vexatious nature of the federal claim, is also present as this is undeniably a repetitive suit.[9]  The fact that this is the second court proceeding which Chico files against Sol seeking the same remedy, and that he has also been actively involved in the EQB's enforcement action, clearly demonstrates that the only reason for filing this complaint after almost six years of litigation in the state courts is to harass and inconvenience Sol.  The Court should not condone such a blatant case of impermissible forum shopping.

The eighth and final factor bears no relevance to the inquiry.

Clearly, these factors weigh in favor of abstention.  Chico filed this RCRA case almost four years after he filed similar claims in the state court.  He has also been actively participating in the EQB enforcement proceedings where testing and remediation measures have been ordered taking his requests into consideration.  Clearly, he has no need for federal court intervention into the matter, except to unduly harass and inconvenience Sol.  All these factors counsel against this court's intervention and it should accordingly abstain from considering the merits of the RCRA claim.

WHEREFORE, Sol very respectfully requests that the Court dismiss Chico's RCRA claims for lack of subject matter jurisdiction because the EQB's diligent prosecution bars the citizen suit and renders his claims as moot.  In the alternative, Sol respectfully requests that the

---

[8] Civil penalties are payable to the United States, not the plaintiff.  *See* 42 U.S.C. § 6928(g) (Violators "shall be liable to the United States for a civil penalty…").

[9] "Repetitive suits might be filed to harass the defendant, because of impatience with the delay in getting a resolution is a court, or in reaction to an adverse ruling that foreshadows a decision on the merits but is not a final resolution that must be accorded res judicata effect."  Erwin Chemerinski, Federal Jurisdiction, § 14.1, p. 815 (3d ed. 1999).

Court abstain from considering the merits of the RCRA claims under the *Burford* and *Colorado River* abstention doctrines.

WE HEREBY CERTIFY that on this same date, we electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification electronically to all counsel of record.

RESPECTFULLY SUBMITTED.

In San Juan, Puerto Rico, this 5th day of May 2009.

**McCONNELL VALDÉS LLC**
*Attorneys for Sol Puerto Rico Limited*
PO Box 364225
San Juan, Puerto Rico 00936-4225
Telephone: (787) 250-5636/5637
Fax: (787) 620-8325

By: s/ José R. González-Irizarry
José R. González-Irizarry
USDC-PR No. 121903
JRGI@mcvpr.com

By: s/ Alejandro J. Cepeda-Díaz
Alejandro J. Cepeda-Díaz
USDC-PR No. 222110
AJC@mcvpr.com

By: s/ Mariana S, Pérez-Cordero
Mariana S. Pérez-Cordero
USDC-PR No. 224911
MSP@mcvpr.com
