UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

CHICO SERVICE STATION, INC.,
and JOSÉ CHICO,

    Plaintiffs,

    v.

SOL PUERTO RICO LIMITED,

    Defendant.

Civil No. 09-1342 (JAF)

**OPINION AND ORDER**

Plaintiffs, Chico Service Station, Inc., and José Chico, bring this action against Defendant, Sol Puerto Rico Limited, under the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(a), seeking civil penalties and injunctive relief for Defendant's alleged release of hazardous materials on Plaintiffs' real property. (Docket No. 1.) Defendant moves for dismissal (Docket No. 6), Plaintiffs oppose (Docket No. 17), and Defendant replies (Docket No. 20).

**I.**

**Factual and Procedural Synopsis**

We draw the following facts from the pleadings and Defendant's submissions in support of its motion. (Docket Nos. 1; 6; 21.) Since April 9, 1987, Plaintiff Chico has been the proprietor of Plaintiff Chico Service Station, which is located in Río Grande, Puerto Rico.

1   Defendant is a licensee of Shell Company (Puerto Rico) Limited ("Shell") and has assumed

2   Shell's obligations in Puerto Rico.

3          Shell had owned and operated underground fuel storage tanks on Plaintiffs' real property

4   since the 1960s. In 1993, Shell informed the Puerto Rico Environmental Quality Board ("EQB")

5   of liquid hydrocarbon substances floating above the groundwater beneath Chico Service Station.

6   In April 2008, Defendant conducted a soil and groundwater test at the site and discovered high

7   concentrations of dissolved benzene in the groundwater beneath Chico Service Station that were

8   well in excess of the federal environmental standard.

9          On August 14, 2003, Plaintiffs filed suit against Shell in the Court of First Instance of the

10  Commonwealth of Puerto Rico. (Docket Nos. 6-10; 21-9.) Plaintiffs alleged, inter alia, that

11  Shell may have caused irreparable environmental damage to Plaintiffs' real property. (Id.)

12  Plaintiffs prayed for both damages and an injunction to compel Shell to conduct environmental

13  tests of the site, carry out any necessary cleanup, and assume the cost of such remedial measures.

14  (Id.) On December 31, 2003, the parties stipulated to a partial dismissal of Plaintiffs' claim for

15  injunctive relief under a settlement agreement. (Docket Nos. 6-13; 21-12.) Shell undertook to

16  remove the storage tanks from the site, conduct soil testing for pollutants, and engage in any

17  remedial measures that EQB may reasonably require. (Id.) On January 15, 2004, the court

18  entered judgment pursuant to the agreement. (Docket Nos.30-4; 34-4.)

19         In March 2004, Shell removed five storage tanks and connected lines. (Docket Nos. 6-

20  14; 21-13.) Shell then submitted a report on the removal to EQB on May 14, 2004. (Docket

Civil No. 09-1342 (JAF)                                                                                          -3-

Nos. 6-16; 21-15.) EQB replied on July 6, 2004, informing Shell that, despite the removal, the site remained listed as a contaminated facility that required corrective action. (Docket Nos. 6-17; 21-16.) EQB demanded that Shell submit a remedial plan before undertaking cleanup. (Id.)

On October 1, 2004, Shell submitted the plan as requested, which detailed tests that were to be conducted on the soil and underground water at the site. (Docket Nos. 6-18; 21-17.) On December 10, 2004, EQB notified Shell of its provisional approval of the plan, which required Shell to inform EQB about the direction of the water flow at the site and ensure that EQB agents observe the taking of soil samples. (Docket Nos. 6-19; 21-18.) EQB informed Shell that the site remained on the list of facilities requiring remediation. (Id.)

On January 17, 2005, Shell requested that Plaintiffs grant it access to the site at the end of the month to conduct the necessary tests pursuant to its remedial plan. (Docket Nos. 6-20; 21-19.) On December 19, 2006, Plaintiffs requested EQB to send them copies of correspondences between EQB and Shell in reference to the cleanup and inquired into the reason for the apparent delay since Shell's submission of its plan. (Docket Nos. 6-21; 21-22.)

On January 16, 2007, Defendant submitted a report on its soil sampling to EQB. (Docket Nos. 6-23; 21-22.) On May 16, 2008, Defendant submitted a supplemental report based on sampling conducted in April 2008. (Docket Nos. 6-24; 21-23.) On May 28, 2008, Plaintiffs wrote to EQB, asserting that Defendant had not complied with its remedial plan from 2004. (Docket Nos. 6-25; 21-24.)

Plaintiffs commenced another action in the Court of First Instance on October 10, 2008, petitioning the Commonwealth court for a writ of mandamus against EQB. (Docket Nos. 6-27; 21-26.) On January 16, 2009, Plaintiffs and EQB concluded a settlement agreement, under which the parties stipulated that EQB would resolve the administrative proceedings pertaining to Plaintiffs' property and afford Plaintiffs an opportunity to be heard and that the parties would present their arguments before EQB, not the Commonwealth court. (Id.) Pursuant to the agreement, the Commonwealth court dismissed the petition as moot on February 4, 2009. (Id.)

Meanwhile, on November 25, 2008, EQB informed Defendant that the agency had rejected Defendant's January 2007 report because it lacked the appropriate standards for a proper evaluation. (Docket Nos. 6-28; 21-27.) EQB advised Defendant that it was in the process of developing these standards in concert with the federal Environmental Protection Agency ("EPA") and that EQB would inform the public once the new guidelines were officially implemented. (Id.) EQB also noted deficiencies in Defendant's testing methods. (Id.) On April 14, 2009, Defendant responded to EQB's letter dated January 22, 2009, which had informed Defendant that its May 2008 supplemental report had been rejected because it related to the earlier report from January 2007. (Docket Nos. 6-30; 21-29.)

On April 14, 2009, Plaintiffs commenced this case in federal district court. (Docket No. 1.) On May 5, 2009, Defendant moved to dismiss for lack of subject-matter jurisdiction. (Docket No. 6.) Plaintiffs opposed on May 26, 2009 (Docket No. 17), and Defendant replied on May 28, 2009 (Docket No. 20). On October 14, 2009, we ordered Plaintiffs to show cause

Civil No. 09-1342 (JAF)                                                                                                           -5-

as to why we should not dismiss their complaint on the basis of res judicata (Docket No. 29); Plaintiffs filed a brief pursuant to our order on October 29, 2009 (Docket No. 30), and Defendant filed a response on November 3, 2009 (Docket No. 33).

## II.

## Standard for Dismissal Under Rule 12(b)(1)

Pursuant to Federal Rule of Civil Procedure 12(b)(1), a movant may challenge the court's subject-matter jurisdiction under a factual challenge by controverting the plaintiff's jurisdictional allegations when they are distinct from the case's merits. Valentín v. Hosp. Bella Vista, 254 F.3d 358, 363 (1st Cir. 2001). The court then addresses "the jurisdictional claim by resolving the [predicate] factual disputes." Id. The party asserting jurisdiction bears the burden of showing its existence. See Skwira v. United States, 344 F.3d 64, 71 (1st Cir. 2003).

## III.

## Analysis

A.   **Order to Show Cause**

On October 14, 2009, we ordered Plaintiffs to show cause as to why we should not dispose of their complaint by applying the earlier settlement between the parties dated December 31, 2003 (Docket Nos. 6-13; 21-12), as res judicata. (Docket No. 29.) On October 29, 2009, Plaintiffs filed a motion in compliance, noting that the earlier partial stipulated dismissal did not indicate that it was with prejudice to further litigation. (Docket No. 30.)

Civil No. 09-1342 (JAF) -6-

Under Rule 39.1 of the Rules of Civil Procedure for the General Court of Justice of 1979, a stipulated judgment is without prejudice if it is silent on the matter. 32 L.P.R.A. App. III (2000). Defendant argues that the policy of finality of judgment and the intent of the parties to dispose of the remedial claim under the settlement militate in favor of res judicata. (Docket No. 33.) The appropriate standard, however, is whether the courts of Puerto Rico "would ascribe preclusive effect to the judgment." Boateng v. InterAmerican Univ., Inc., 210 F.3d 56, 61 (1st Cir. 2000). The earlier dismissal omitted any reference to prejudice to subsequent litigation. (Docket Nos. 30-4; 34-4.) We, therefore, accept Plaintiffs' argument and now address Defendant's contentions against our subject-matter jurisdiction (Docket No. 6).

**B.    Abstention Doctrine**

In their complaint, Plaintiffs accused Defendant of violations of federal statutes pertaining to the handling and disposal of hazardous wastes and underground storage tanks and of contribution to improper handling of waste matter (Docket No. 1). See 42 U.S.C. §§ 6903, 6921-6939e, 6991-6991i, 6972(a)(1). The RCRA authorizes private civil actions to enforce federal standards pertaining to the handling of hazardous wastes and underground storage tanks against private parties. § 6972(a)(1). Moreover, benzene is listed as a hazardous waste material. 40 C.F.R. § 261.31(a).

Defendant moves to dismiss on the basis of, inter alia, federal abstention doctrine. (Docket No. 6.) Defendant cites Burford v. Sun Oil Co., 319 U.S. 315 (1943), and Colorado River Water Conservation District v. United States, 424 U.S. 800 (1976), in support.

In general, "federal courts have a strict duty to exercise the jurisdiction that is conferred upon them by Congress." Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 716 (1996). Nevertheless, "in certain circumstances a federal court [must] abstain in favor of state processes where federal litigation would interfere with a state administrative scheme and where adequate state judicial review exists." Sevigny v. Employers Ins. of Wasau, 411 F.3d 24, 26 (1st Cir. 2005). "The fundamental concern in Burford is to prevent federal courts from bypassing a state administrative scheme and resolving issues of state law and policy that are committed in the first instance to expert administrative resolution." Id. at 27 (citing Pub. Serv. Co. v. Patch, 167 F.3d 15, 24 (1st Cir. 1998)).

> Where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings . . . of state administrative agencies: (1) when there are 'difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar'; or (2) where the 'exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.'

New Orleans Pub. Serv., Inc. v. Council of New Orleans (NOPSI), 491 U.S. 350, 361 (1989) (quoting Colo. River, 424 U.S. at 814).

"[F]ederal courts have the power to dismiss . . . cases based on abstention principles only where the relief being sought is equitable or otherwise discretionary." Quackenbush, 517 U.S. at 731. Abstention may extend to suits for damages where federal adjudication could interfere with state proceedings, but the federal court may only stay the action pending resolution of the

Civil No. 09-1342 (JAF)                                                                                        -8-

state proceedings, rather than dismissing the case outright.[1]  Id. at 730.  Abstention presumptively applies where a state agency has rendered a decision.  Sevigny, 411 F.3d at 28.

As the applicability of abstention doctrines to the RCRA remains an issue of first impression in the First Circuit, we look to our sister jurisdictions for guidance.  In an analogous scenario, the Sixth Circuit applied NOPSI to abstain where the state of Kentucky evinced a clear interest in hazardous waste disposal by enacting a broad statutory scheme and an administrative process governing permits for hazardous waste facilities; federal adjudication would have been "disruptive of Kentucky's efforts to establish a coherent policy with respect to the licensing of hazardous waste facilities"; and it was impossible to disentangle the federal claim from state law because the state regulatory scheme explicitly incorporated RCRA provisions.  Coal. for Health Concern v. LWD, Inc., 60 F.3d 1188, 1194 (6th Cir. 1995).  Furthermore, Judge Posner of the Seventh Circuit has opined that abstention may apply "in cases in which a state has a formal administrative proceeding in progress that the citizens' suit would disrupt."  PMC, Inc. v. Sherwin-Williams Co., 151 F.3d 610, 619 (7th Cir. 1998) (noting that affirmative defense of diligent state prosecution under 42 U.S.C. § 6972(b)(2)(C) applies only to civil cases in judicial court, not administrative proceedings).

---

[1] Similarly, under Colorado River abstention, the court may only stay proceedings pending the outcome of parallel state proceedings, not dismiss the federal case in its entirety.  Rivera-Feliciano v. Acevedo-Vila, 438 F.3d 50, 60 (1st Cir. 2006).

Civil No. 09-1342 (JAF) -9-

Based on the available record and Commonwealth laws and regulations, we find compelling reasons to abstain from adjudicating the instant case. At the threshold, the record abounds with evidence of adequate judicial review in the Commonwealth courts with respect to the underlying dispute. At the moment, two Commonwealth judgments govern the matter at hand. Under its stipulated partial dismissal of December 31, 2003, Defendant has undertaken to subject itself to scrutiny by EQB with respect to its handling of storage tanks and potential contamination on Plaintiffs' property. (Docket Nos. 6-13; 21-12.) Also, under a subsequent settlement agreement dated January 31, 2009, EQB must afford Plaintiffs an opportunity to be heard in the proceedings relating to Plaintiffs' property, and EQB must bring the matter to a close. (Docket Nos. 6-27; 21-26.) We further note that Puerto Rico law generally provides for judicial review of administrative agency decisions. See 3 L.P.R.A. §§ 2171-2177 (2006). Accordingly, we find that adequate recourse may be had in the local courts for EQB decisions so as to implicate the rule in NOPSI. See 491 U.S. at 361.

We note that, like Kentucky, Puerto Rico has adopted a regulatory scheme pertaining to underground storage tanks. See generally "Reglamento para el Control de los Tanques de Almacenamiento Soterrados," EQB No. 4362 (Nov. 7, 1990). In their complaint, Plaintiffs explicitly refer to several provisions of these regulations as a measure of Defendant's alleged violations. (Docket No. 1.) EQB's ongoing correspondence with the parties in this case confirms that Puerto Rico has a substantial policy interest in the uniform regulation of

underground storage tanks, akin to that of Kentucky's oversight of hazardous wastes. See Coal. for Health Concern, 60 F.3d at 1194.

Moreover, federal judicial intervention in this case could interfere with the uniform formation and application of environmental regulations by EQB with respect to underground storage tanks and hazardous effluents from these tanks. EQB's letter to Defendant dated November 25, 2008, indicated that EQB and EPA were engaged in a joint effort to create appropriate guidelines for underground storage tanks, which must then undergo a public review process before formal promulgation. (Docket Nos. 6-28; 21-27.) EQB cited this rationale in rejecting Defendant's report on soil testing at Plaintiffs' site and instructed Defendant to await the adoption of uniform rules. (Id.) Our adjudication of Plaintiffs' case at this juncture would essentially sidestep the efforts of EPA and EQB, both expert agencies in the field of environmental regulation, and potentially disrupt uniform regulation of underground storage tanks by rendering a decision that is contrary to the contemplated guidelines. See NOPSI, 491 U.S. at 361; Coal. for Health Concern, 60 F.3d at 1194.

Furthermore, Puerto Rico's regulation of underground storage tanks is entangled with federal regulation, because EPA has expressly delegated authority to EQB to formulate guidelines. See 40 C.F.R. § 282.102. Plaintiffs correctly note that EPA has not similarly delegated authority to EQB with respect to the control of hazardous waste material (Docket No. 17). See id. §§ 272.2650 - .2699. However, judicial intervention in the area of hazardous effluents from underground tanks would impinge on the control of the tanks themselves.

Because EQB has not rendered a final decision in this matter, there is no presumption in favor of abstention. See Sevigny, 411 F.3d at 28. Nevertheless, Defendant has adduced evidence of ongoing administrative proceedings relating to the res in the instant case. Moreover, because Plaintiffs have stipulated to the resolution of their grievances before EQB in lieu of judicial oversight in the Commonwealth courts (Docket Nos. 6-27; 21-26), there is no unfairness in permitting the agency to work unimpeded. We heed Judge Posner's admonition against permitting civil suits to disrupt concurrent administrative proceedings. See PMC, 151 F.3d at 619. We, therefore, hold that, in view of the conjunction of keen local interest in uniform regulation and parallel proceedings, judicial prudence favors abstention in the present case. See NOPSI, 491 U.S. at 361; Coal. for Health Concern, 60 F.3d at 1194.

Lastly, we note that the relief sought by Plaintiffs in this case does not prevent us from disposing the complaint in its entirety. In addition to their prayers for injunctions, Plaintiffs demand the imposition of civil penalties against Defendant. (Docket No. 1.) In Tull v. United States, the Court held that a defendant's liability for civil penalties under the Clean Water Act was the proper province of the jury, not the equitable discretion of the judge. 481 U.S. 412, 423 (1987). The Tull Court reasoned that civil penalties are punitive rather than restorative, and hence not the sort of relief that courts in equity could grant at common law. Id. at 422. In reaching its conclusion that "the nature of the relief authorized" was a claim at law, the Court pointed to the statutory structure, which set out injunctive relief separately from the provision

Civil No. 09-1342 (JAF)                                                                           -12-

for civil penalties.  Id. at 423, 425.  Despite committing the issue of liability to the jury, Tull permits the judge considerable discretion to assess the amount of penalty if any.  Id. at 427.

We find no controlling decisions interpreting the civil penalty provision under the RCRA in light of Tull.  However, in Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc., the Court distinguished Tull, finding that the civil penalty provision for citizens' suits under the Clean Water Act was entwined with the provision's authorization of equitable remedies.  484 U.S. 49, 59 (1987).  Because both remedies were referenced in the same subsection, the Court held that citizens' claims for civil penalties necessarily became bills in equity.  Id. at 58-59.

In this case, the RCRA provision for civil penalties in citizens' suits follows the authorization of injunctive relief in the same sentence.  42 U.S.C. § 6972(a).  Under Gwaltney, we hold that citizens' actions for civil penalties under the RCRA are claims in equity.  See 484 U.S. at 58-59.  In view of the equitable nature of the remedies sought by Plaintiffs, and our broad discretion to assess civil penalties, Tull, 481 U.S. at 427, we may dismiss Plaintiffs' case in its entirety under the Burford abstention doctrine.[2]  See Quackenbush, 517 U.S. at 731.

---

[2] Because we dismiss Plaintiffs' case on the basis of abstention, we need not consider Defendant's remaining arguments against jurisdiction (Docket No. 6).

Civil No. 09-1342 (JAF)                                                                                          -13-

## IV.

## Conclusion

Accordingly, we hereby **NOTE** Plaintiffs' motion in compliance (Docket No. 30), and **GRANT** Defendant's motion to dismiss (Docket No. 6). We **DISMISS** Plaintiffs' complaint on <u>Burford</u> abstention considerations.

**IT IS SO ORDERED.**

San Juan, Puerto Rico, this 4th day of December, 2009.

                                                 s/José Antonio Fusté
                                              JOSE ANTONIO FUSTE
                                              Chief U.S. District Judge